# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KEALO HIGGINS                                          CIVIL ACTION

VERSUS                                                 NO. 07-9729

WARDEN BURL CAIN                                       SECTION "I"(4)

## REPORT AND RECOMMENDATION

On August 13, 2012, this matter was reopened and referred to a United States Magistrate

Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed

findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable,

**Rule 8(b) of the Rules Governing Section 2254 Cases**.[1]   Upon review of the entire record, the

Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28

U.S.C. § 2254(e)(2) (2006).[2]

## I.    Factual Background

The petitioner, Kealo Higgins ("Higgins"), is a convicted inmate incarcerated in the

Louisiana State Penitentiary in Angola, Louisiana.[3]  On August 24, 2001, Higgins was indicted by

---

[1]Rec. Doc. No. 23.

[2]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[3]Rec. Doc. Nos. 3, 22.

a Grand Jury in St. Tammany Parish for the second degree murder of Frederick Adams on June 18, 2001.[4]

The record reflects that, on that date, June 18, 2001, Jerry Domecq, Jr. was spending the night with a friend, David McClure, at 1800 Cheshire Court in Slidell, Louisiana.[5] According to Domecq, Adams called him and McClure to obtain $400.00 worth of Ecstasy tablets. Domecq had known Adams since elementary school. Adams and Higgins garnered a ride from Delisa Brown, to whom Adams gave directions to the Cheshire Court address. With Brown driving the car, Higgins rode in the front passenger seat and Adams rode in the back seat. Brown was unaware that the purpose of the trip that night was for a drug transaction.

Upon their arrival, Domecq approached the car with 20 Ecstasy tablets on his person. He handed some tablets to Adams, who tested them. Adams handed one tablet to Higgins, and he asked to buy five more. Domecq requested payment for the first 20 tablets before he would provide the additional five Higgins wanted.

At this point, while Brown could not hear all of the dialogue that took place between the men, she saw Higgins raise his shirt and reveal a brown handle. Higgins then exited the vehicle, pointed the snub-nosed pistol at Domecq, and told him "to give me everything you got." Domecq gave him the Ecstasy tablets he had. Higgins then told Adams to get out of the car, and he complied. Higgins then told Adams to give him his money and empty his pockets.

A struggle ensued between Higgins and Adams, and Higgins hit Adams on the head with the pistol. Adams fell to the ground and was "out for a minute" according to Brown. Higgins then

---

[4]St. Rec. Vol. 2 of 4, Indictment, 8/24/01; Grand Jury Return, 8/24/01.

[5]The facts were taken from the unpublished opinion of the Louisiana First Circuit Court of Appeal. St. Rec. Vol. 1 of 4, 1st Cir. Opinion, 2004-KA-0503, pp. 2-6, 10/29/04.

rummaged through Adams's pockets. Adams eventually got up and began running and Higgins chased him. Brown and Domecq then heard four or five gunshots.

Higgins soon ran back to Brown's car and instructed her to drive off. After she was unable to navigate the neighborhood, Higgins then got into the driver seat and Brown moved to the passenger seat. He drove to an apartment complex and hid the gun in a closet that housed the connections for the washing machines in the complex laundry room.[6]

Adams died from the wounds inflicted by Higgins. The cause of death was multiple gunshot wounds, i.e. five wounds to the right arm, back, face, and head.

Higgins initially entered a plea of not guilty on September 5, 2001.[7] Over the course of time, Higgins and his counsel filed numerous motions to suppress the evidence, the confession, and the identification.[8] On February 22, 2002, Higgins's counsel filed a motion, which he supplemented on April 1, 2002, requesting the appointment of a sanity commission, and the Trial Court granted the motion.[9]

At the first competency hearing held May 7, 2002, the trial court reviewed and accepted the commission doctors' reports and ordered that Higgins be incarcerated for 90 days in the St. Tammany Parish Jail for observation by Susan Johannsen, MSW, the District Forensic Coordinator

---

[6]According to their testimony, Brown was separately charged as an accessory after the fact, with an offer for the charges to be dropped in return for her testimony, and Domecq was eventually convicted of possession with intent to distribute 53 Ecstasy tablets unrelated to this incident.

[7]St. Rec. Vol. 2 of 4, Minute Entry, 9/5/01.

[8]St. Rec. Vol. 2 of 4, Motion to Suppress the Evidence, 9/21/01; Motion to Suppress the Confession, 9/21/01; Pro Se Motion to Suppress Evidence, 10/23/01; Motion to Suppress Confession, 6/2/03; Motion to Suppress Identification, 6/2/03.

[9]St. Rec. Vol. 2 of 4, Minute Entry, 3/8/02; Motion to Order Sanity Commission, 2/22/02; Supplemental Motion to Order Sanity Commission, 4/1/02.

for the State of Louisiana.[10]  The Court conducted a follow-up hearing on April 28, 2003, at which time the Trial Court found Higgins to be competent to proceed after hearing the testimony from the doctors and Johannsen.[11]

Shortly thereafter, on June 17, 2003, Higgins withdrew his previous plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity.[12]  On September 3, 2003, Higgins's counsel withdrew the pending motions to suppress and for other discovery.[13]

Higgins was tried before a jury on September 22, 23, and 24, 2003, and was found guilty as charged.[14]  The Trial Court sentenced Higgins on November 3, 2003, to serve life in prison at hard labor without benefit of parole, probation, or suspension of sentence.[15]

On direct appeal to the Louisiana First Circuit Court of Appeal, Higgins's appointed counsel raised on error asserting that there was insufficient evidence to support the verdict because rational jurors should have found that Higgins had shown that he was insane at the time of the offense.[16] Higgins also argued pro se that he was denied a full and fair competency hearing with sufficient

---

[10]St. Rec. Vol. 2 of 4, Minute Entry, 5/7/02; Hearing Transcript, p. 2, 5/7/02; see also, Competency Hearing Transcript, p. 19 (Johannsen's testimony giving her title), 4/28/03.

[11]St. Rec. Vol. 2 of 4, Minute Entry, 4/28/03; Competency Hearing Transcript, pp. 29-31, 4/28/03.

[12]St. Rec. Vol. 2 of 4, Minute Entry, 6/17/03; Hearing Transcript, 6/17/03.

[13]St. Rec. Vol. 2 of 4, Minute Entry, 9/3/03.

[14]St. Rec. Vol. 2 of 4, Trial Minute, 9/22/03; Trial Minutes, 9/22/03; Trial Minutes, 9/23/03; Trial Minutes, 9/24/03; Jury Verdict, 9/24/03; Trial Transcript, pp. 1-97, 9/22/03; St. Rec. Vol. 3 of 4, Trial Transcript (continued), pp. 98-218, 9/22/03; Trial Transcript, pp. 1-129, 9/23/03; St. Rec. Vol. 4 of 4, Trial Transcript (continued), pp. 130-166, 9/23/03; Trial Transcript, 9/24/03.

[15]St. Rec. Vol. 2 of 4, Sentencing Minutes, 11/3/03; St. Rec. Vol. 4 of 4, Sentencing Transcript, 11/3/03.

[16]St. Rec. Vol. 2 of 4, Appeal Brief, 04-KA-0503, 3/24/04.

evidence to establish that he was competent to stand trial.[17]  The Louisiana First Circuit affirmed

Higgins's conviction and sentence on October 29, 2004, finding no merit in the claims raised.[18]

The Louisiana Supreme Court denied Higgins's subsequent writ application without stated

reasons on April 1, 2005.[19]  Higgins's conviction and sentence became final 90 days later, on June

30, 2005, because he did not file a writ application with the United States Supreme Court. *Ott v.

Johnson*, 192 F.3d 510, 513-14 (5th Cir. 1999) (period for filing for certiorari with the United States

Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S.

S.Ct. Rule 13(1).

## II.    State Procedural History

On June 19, 2006, Higgins submitted an application for post-conviction relief to the Trial

Court raising the following grounds for relief:[20] (1) ineffective assistance of counsel during the

competency hearing; (2) ineffective assistance of counsel during trial for failure to call witnesses

and investigate his prior medical history; and (3) ineffective assistance of appellate counsel for

failure to familiarize herself with Higgins and/or his case before lodging the appeal.  On September

13, 2006, the Trial Court denied Higgins's application for failure to prove grounds upon which relief

could be granted, citing La. Code Crim. P. arts. 930.2 and 930.3.[21]

---

[17]St. Rec. Vol. 2 of 4, Pro Se Supplemental Brief, 04-KA-0503, 5/19/04.

[18]St. Rec. Vol. 1 of 4, 1st Cir. Opinion, 2004-KA-0503, 10/29/04.

[19]*State v. Higgins*, 897 So.2d 599, 599 (La. 2005); St. Rec. Vol. 1 of 4, La. S. Ct. Order, 2004-KO-3101, 4/10/2005; La. S. Ct. Letter, 2004-KO-3101, 12/16/04 (showing timely postmark of 11/19/04).

[20]St. Rec. Vol. 1 of 4, Uniform Application for Post-Conviction Relief, 6/23/06 (dated 6/19/06).  Higgins also filed a supplemental memorandum adding additional grounds of ineffective assistance of counsel during trial.  St. Rec. Vol. 1 of 4, First Supplemental Application, 8/10/06.

[21]St. Rec. Vol. 1of 4, Reasons for Judgment, 9/13/06.

The Louisiana First Circuit denied Higgins's related writ application without stated reasons on December 28, 2006.[22] The Louisiana Supreme Court also denied without comment Higgins's timely[23] filed writ application to that Court on November 2, 2007.[24]

## III.  Federal Petition

On January 14, 2008, the clerk of this Court filed Higgins's petition for federal habeas corpus relief in which he raised three grounds for relief:[25] (1) trial counsel was ineffective throughout the competency hearing; (2) trial counsel was ineffective throughout the course of the trial when he failed to call witnesses or investigate prior medical history; and (3) appellate counsel was ineffective when she failed to familiarize herself with Higgins or the case before lodging the appeal.

On May 16, 2008, the State filed a response in opposition to Higgins's petition alleging that the petition was not timely filed.[26] Higgins filed a reply to the State's opposition expressing reasons why he believed the defense should be rejected and the merits of his claims considered.[27] The Court disposed of Higgins petition as time barred on January 13, 2011.[28]

---

[22]St. Rec. Vol. 1 of 4, 1st Cir. Order, 2006-KW-2257, 12/28/06.

[23]The State failed to provide the Court with the records from the Louisiana Supreme Court as ordered in 2008, and the Court can not look to the petition to confirm its filing date or contents. Nevertheless, the Court obtained information from the office of the clerk of the Louisiana Supreme Court that Higgins's writ application was filed on February 7, 2007, and was postmarked on January 26, 2007. La. S.Ct. R. X§5(a) provides that an application seeking review of the judgment of a court of appeal shall be filed or postmarked within 30 days of the issuance of the judgment. Based on the postmark date, the writ application was timely under state and federal law, having been submitted to prison officials for mailing in a timely manner.

[24]*State ex rel. Higgins v. State*, 966 So.2d 595, 595 (La. 2007); St. Rec. Vol. 1 of 4, La. S. Ct. Order, 2007-KH-0255, 11/2/07.

[25]Rec. Doc. No. 3.

[26]Rec. Doc. Nos. 12, 13.

[27]Rec. Doc. No. 15.

[28]Rec. Doc. Nos. 16, 17, 18, 21.

On June 27, 2012, Higgins moved the Court to reconsider the dismissal under Fed. R. Civ. P. 60(b) seeking reconsideration of the Court's judgment. In the motion, Higgins sought equitable tolling for the period of time that the judicial system in St. Tammany Parish was impacted by Hurricane Katrina, and he was unable to seek post-conviction relief in the state courts during the suspension of deadlines related to Hurricane Katrina in 2005.[29]

On August 13, 2012, the Court granted Higgins's motion in light of the circumstances of Hurricane Katrina and the suspension of deadlines previously recognized by this Court.[30] In doing so, the Court afforded Higgins an additional 86 days of tolling, which rendered his federal petition timely filed. The Court referred the matter to the United States Magistrate Judge for consideration of the merits of the petition.

Based on the pleadings and the state court record, the Court does not require additional briefing to dispose of Higgins's claims.

## IV. General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[31] applies to this petition, which is deemed filed in this Court under the federal mailbox rule on December 3, 2007.[32] The threshold questions in habeas review under the amended

---

[29]Rec. Doc. No. 22.

[30]Rec. Doc. No. 23.

[31]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[32]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999), *cert. denied*, 529 U.S. 1057 (2000);

statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)). The Court having recently negated the State's timeliness defense, the record does not contain any procedural defenses for the Court to consider.

## V.  **Standards of Review on the Merits**

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determination of questions of fact are presumed correct and the court must give deference to the state court findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable

---

*Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Higgins's petition on January 14, 2008, when the filing fee was paid after pauper status was denied. Higgins's signature on the petition is dated December 3, 2007. This is the earliest date on which he could have submitted the pleadings to prison officials for mailing. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition. *See Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 376).

application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *Penry*, 532 U.S. at 792-93. The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *Id.* "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting

*Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

## VI.    Ineffective Assistance of Counsel

Higgins alleges that his trial and appellate counsel were ineffective in their respective roles. Under a broad reading of his petition coupled with a review of his state court post-conviction pleadings, he argues that trial counsel failed to adequately challenge the Trial Court's finding of competence based on an inadequate showing by the State. He also argues that trial counsel failed to present his prior medical records and subpoena a psychiatrist to meet the defense burden to show incompetence and support for the plea of not guilty and not guilty by reason of insanity.

Higgins further contends that trial counsel similarly was ineffective during trial when he failed to call witnesses and present medical records to support his insanity defense. Specifically, he suggests that additional evidence was needed to show that, because of his Ecstasy use, he could not have had specific intent to kill and was legally insane at the time of the offense.

With regard to appellate counsel, Higgins argues that she should not have continued with the same frivolous defense of insufficient evidence and instead should have urged a claim of ineffective assistance of trial counsel as he has set forth.

Higgins raised these claims in his application for post-conviction relief to the Trial Court. The Court denied relief finding no proof of his entitlement to relief. His subsequent writ applications to the Louisiana First Circuit and the Louisiana Supreme Court were denied without stated reasons.

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009). The question is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

The appropriate standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *See Strickland*, 466 U.S. at 697. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide

range of reasonable representation. *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 787 (2011) (citing *Strickland*, 466 U.S. at 689).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 131 S.Ct. at 1403 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 131 S.Ct. at 792.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross*, 694 F.2d at 1012).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 131 S.Ct. at 788. The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a

general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id.* at 788 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." *Cullen*, 131 S.Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689, and quoting *Knowles*, 556 U.S. at 121 n.2).

### A. Trial Counsel at the Competency Proceeding

Higgins argues that his counsel failed to adequately challenge the Trial Court's competency finding and present additional or stronger evidence of his incompetence. He contends that it was inappropriate for counsel to allow the Trial Court to take the word of a social worker over the recommendations of the doctors on the lunacy committee. For the following reasons, Higgins has failed to establish any error or prejudice resulting from his counsel's performance during the competency proceedings.

The initial lunacy commission reports submitted by Dr. Rafael Salcedo, Ph.D. and Dr. Richard Richoux, M.D. both noted that Higgins's reported prior mental health treatment related to two incidents, in 1997 and 2001, when he played "Russian Roulette" with a friend.[33] He was admitted for "a couple of weeks, give or take" to the New Orleans Adolescent Hospital after the first

---

[33]St. Rec. Vol. 2 of 4, Psychiatric Report (Richoux), p.1, 4/12/02; Psychiatric Report (Salcedo), p. 1, 4/11/02.

incident in 1997.[34]  He was seen on an outpatient basis for less than one month at a facility on

Jackson Avenue in 2001.[35]

Both doctors also indicated that Higgins was uncooperative during their respective

examinations.[36]  His apparently "elected" and made a "purposeful choice" not to cooperate, and his

refusal to answer basic questions that were related to the "*Bennett* criteria."[37]  This voluntary failure

to cooperate made it difficult for both doctors to reach a conclusive determination of his mental

state.

The doctors' references to the "*Bennett* criteria" are related to the Louisiana Supreme Court

case of *State v. Bennett*, 345 So.2d 1129 (La. 1977), in which that Court held:

> The decision as to a defendant's competency to stand trial should not turn solely
> upon whether he suffers from a mental disease or defect, but must be made with
> specific reference to the nature of the charge, the complexity of the case and the
> gravity of the decisions with which he is faced.  Appropriate considerations in
> determining whether the accused is fully aware of the nature of the proceedings
> include: whether he understands the nature of the charge and can appreciate its
> seriousness; whether he understands what defenses are available; whether he can
> distinguish a guilty plea from a not guilty plea and understand the consequences of
> each; whether he has an awareness of his legal rights; and whether he understands
> the range of possible verdicts and the consequences of conviction.  Facts to consider
> in determining an accused's ability to assist in his defense include: whether he is able
> to recall and relate facts pertaining to his actions and whereabouts at certain times;
> whether he is able to assist counsel in locating and examining relevant witnesses;
> whether he is able to maintain a consistent defense; whether he is able to listen to the
> testimony of witnesses and inform his lawyer of any distortions or misstatements;
> whether he has the ability to make simple decisions in response to well-explained
> alternatives; whether, if necessary to defense strategy, he is capable of testifying in
> his own defense; and to what extent, if any, his mental condition is apt to deteriorate
> under the stress of trial.

---

[34]St. Rec. Vol. 2 of 4, Psychiatric Report (Salcedo), p. 1, 4/11/02.

[35]*Id.*

[36]St. Rec. Vol. 2 of 4, Psychiatric Report (Richoux), p.1, 4/12/02; Psychiatric Report (Salcedo), pp. 2-3, 4/11/02.

[37]St. Rec. Vol. 2 of 4, Psychiatric Report (Richoux), p.1, 4/12/02; Psychiatric Report (Salcedo), p. 3, 4/11/02.

*Id.* at 1138 (citations omitted); *see also State v. Silva*, 699 So.2d 487, 490-491 (La. App. 4th Cir. 1997).

In this case, Dr. Richoux indicated that Higgins unwillingness to cooperate "does not reflect a mental disorder."[38] Dr. Salcedo also indicated in his report that, while he was unable to positively conclude that Higgins met the *Bennett* criteria, he "found no objective evidence that he presently suffers from a mental disorder which would preclude his being able to do so." Nevertheless, out of an abundance of caution and as a result of the inconclusive initial examinations, both doctors recommended that Higgins be committed to the Eastern Louisiana Mental Health System - Forensic Division for a thorough evaluation and treatment if deemed necessary.[39]

At the first competency hearing held May 7, 2002, the reports were presented to the Trial Court. The Court accepted the reports. In light of the doctors' recommendations for further evaluation, the Court agreed to order Higgins to remain incarcerated for 90 days in the St. Tammany Parish Jail for observation by Susan Johannsen, MSW, the District Forensic Coordinator for the State of Louisiana.[40] As agreed to by the State and defense counsel, this arrangement was made because "to do otherwise would take at least eight months to send him to a psychiatric facility and this may expedite matters."[41]

---

[38]St. Rec. Vol. 2 of 4, Psychiatric Report (Richoux), p.1, 4/12/02.

[39]St. Rec. Vol. 2 of 4, Psychiatric Report (Richoux), p.1, 4/12/02; Psychiatric Report (Salcedo), p. 3, 4/11/02.

[40]St. Rec. Vol. 2 of 4, Minute Entry, 5/7/02; Hearing Transcript, p. 2, 5/7/02; *see also* Competency Hearing Transcript, p. 19 (Johannsen's testimony giving her title), 4/28/03.

[41]St. Rec. Vol. 2 of 4, Hearing Transcript, p. 3, 5/7/02.

The Court conducted the follow-up hearing on April 28, 2003.[42]  The Court heard the testimony of Dr. Salcedo, Dr. Richoux, and Ms. Johannsen.  Dr. Salcedo testified that he met with Higgins three times over the prior nine or ten months and was unable to get any cooperation from him.[43]  He described Higgins's answers to very basic questions to be vague and evasive, many times answering "I don't know."

He found this to be inconsistent with Higgins's jail behavior when he was observed interacting with other inmates and jail staff.  He stated that "I show no evidence that this man presently suffers from a diagnoseable [sic] mental disorder."[44]  After his first interview, he gave Higgins the benefit of the doubt and deferred to further evaluation.  After examining Higgins three times, he concluded that "I am prepared to indicate to the court that I see no evidence of a mental disorder which would affect [sic] his ability to be competent under the Bennett criteria."[45]

Dr. Salcedo also received additional information from Ms. Johannsen regarding her observations, including the fact that "he actually runs one of the tiers and he is very involved with other inmates and again does not act like he does when I examine him."[46]  Dr. Salcedo indicated that he submitted a supplemental report to the Court consistent with his testimony.[47]  He also indicated

---

[42]St. Rec. Vol. 2 of 4, Minute Entry, 4/28/03; Competency Hearing Transcript, 4/28/03.

[43]Id. at p. 8.

[44]Id.

[45]Id. at p. 8-9 (formatting in original).

[46]Id. at p. 9.

[47]Id. at p. 10.  The record does not contain a copy of a supplemental report.

on cross-examination that he was not able to state that Higgins actually met the *Bennett* standards because he was so uncooperative and refused to answer the relevant questions.[48]

Dr. Richoux also testified that he was not able to gain Higgins's cooperation to determine whether he qualified under the *Bennett* factors.[49] At the initial examination, he found Higgins to be coherent but he would not answer the doctor's basic questions.[50] As a result, although he did not display anything to indicate the presence of a diagnosable mental disorder, Higgins's interaction could have been related to a paranoia from a mental illness. This is why he called for additional evaluation.

When Dr. Richoux saw Higgins's again on January 18, 2003, he also had the benefit of Dr. Salcedo's subsequent evaluations and the information provided by Ms. Johannsen. He spoke with Dr. Salcedo and was informed that he did not observe any mental illness on his two subsequent visits.[51] Ms. Johannsen had multiple interactions with Higgins over a period of months, and she also observed nothing suggestive of a mental illness. Having received this information, Dr. Richoux examined Higgins and found him coherent and organized, yet still uncooperative when answering questions specifically related to the *Bennett* factors. He was not able to reach a conclusion because Higgins refused to discuss his legal rights.

Dr. Richoux concluded that "based on all the information available to me right now that Mr. Higgins does not suffer from a major mental disorder and that his lack of cooperation is volitional.

---

[48]*Id*. at p. 11.

[49]*Id*. at p. 12.

[50]*Id*. at p. 13.

[51]*Id*. at p. 14.

He chooses not to cooperate."[52]  He found nothing in his examinations or any prior medical reports of a mental illness that would prevent Higgins from understanding the nature of the proceedings or that would prevent him from assisting counsel in his defense under the Bennett criteria.[53]  He agreed that the only other course of action would be to place him in a hospital for evaluation, which is essentially what Ms. Johannsen had already done.  He informed the Court that based on the information he had, "it is more probable than not that if he chooses to do so Mr. Higgins can understand the proceedings and can assist counsel."[54]

Ms. Johannsen also testified before the Court that, while she did speak with him at times, she more often would observe Higgins without him knowing she was watching him.[55]  She resolved that "[t]here is nothing that he presented that would have  him where he would be unable to understand the Bennett Criteria."[56]  She indicated that Higgins never refused to see her, but he did not necessarily answer her questions.[57]  She spoke with him about being more cooperative with the sanity commission, but "[h]e felt they were assholes."[58]  She indicated that he would not have a problem understanding the consequences of a guilty or not guilty plea, and that he was aware of his legal rights, the range of verdicts, and their consequences.[59] Although he had been on and off of his

---

[52]*Id*. at pp. 14-15.

[53]*Id*. at p. 15.

[54]*Id*. at p. 18.

[55]*Id*. at p. 22.

[56]*Id*. (formatting in original).

[57]*Id*. at p. 23.

[58]*Id*.

[59]*Id*. at p. 24.

antidepressants due to his incarceration, she did not see anything in his interactions with others that would prohibit him from understanding or assisting his counsel.[60]  She advised the Court that "[i]f I had not felt Mr. Higgins could proceed, I would not have asked for him to be reevaluated."[61]  She also saw no benefit to sending him to a forensic facility for further evaluation.  She observed no psychotic behavior and no hallucinations.[62]  He answered her questions appropriately and did not appear to be mentally deficient.

Based on the testimony of all three witnesses, the Trial Court found Higgins to be competent to stand trial and to assist his counsel under the *Bennett* criteria.[63]  The Court found Higgins to be neat in his appearance and observed him interacting with his own counsel during the proceedings.[64]  The Court noted the doctors' resolve that it was more probable than not that Higgins could assist in his defense.[65]  He further indicated that Ms. Johannsen saw no signs of psychosis or paranoia, which was substantiated by the testimony of the two doctors.[66]  The Court, in apparent reliance on the testimony that Higgins *chose* to be uncooperative, also indicated that "to send this defendant to a hospital, a psychiatric or forensic unit for evaluation would be a vain and useless thing based upon the testimony that I have heard."[67]

---

[60]*Id*. at pp. 24, 25.

[61]*Id*. at p. 25.

[62]*Id*. at p. 28.

[63]*Id*. at p. 30.

[64]*Id*. at p. 31.

[65]*Id*. at p. 29.

[66]*Id*. at pp. 29-30.

[67]*Id*. at p. 30.

Contrary to Higgins's arguments, the Trial Court did not "take the word" of Ms. Johannsen over that of Drs. Salcedo and Richoux.  On the contrary, Ms. Johannsen testified that her only role was to assist Higgins in gaining an understanding of the *Bennett* criteria; it was the job of the sanity commission doctors to make a diagnosis and recommendation to the Court.  She also testified that Higgins was cooperative with her; both doctors testified that Higgins was uncooperative at all times.  Based on the Trial Court's ruling, Ms. Johannsen's testimony in that regard was disregarded.

A fair reading of the transcript indicates that both Dr. Salcedo and Dr. Richoux felt that Higgins was malingering or manipulating or choosing not to answer questions he knew to be relevant to their diagnosis on competency.  Both doctors agreed that the evaluation done by Ms. Johannsen was equivalent to confinement in a mental health facility.  They also both resolved that further commitment in a mental health facility would serve no purpose.  These conclusions by Dr. Salcedo and Dr. Richoux were the determinate factors for the Trial Court, who also spoke of the law's answer to those like Higgins who "very easily play the entire system . . . by remaining mute."[68]

As an initial matter, counsel was clearly aware of Higgins mental health claims since he was the one who moved for the sanity commission and raised the insanity defense, a matter addressed in Higgins's next issue.  To say counsel did no investigation into Higgins mental state would be inaccurate.

Higgins also seems to be confusing the standards of competency to assist at trial and the standards by which his mental state at the time of the shooting is judged.  The affirmative defense of insanity requires the jury to determine whether, at the time of the offense, the petitioner was incapable of appreciating the nature and wrongfulness of his conduct.  *United States v. Levine*, 80

---

[68]*Id.* at p. 30.

F.3d 129 (5th Cir. 1996), *cert. denied*, 519 U.S. 824 (1996); *see also*, La. Rev. Stat. Ann. § 14:14. This goes to the weight of the evidence surrounding his mental state at the time of the offense. This is what Higgins addresses in his next claim.

This claim is pointed at his competence to proceed. The Constitution also prohibits the trial and conviction of a criminal defendant who is mentally incompetent to assist with his defense. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Drope v. Missouri*, 420 U.S. 162, 171-172 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Carter v. Johnson*, 131 F.3d 452, 459 (5th Cir. 1997). A two-part standard for ascertaining competency to assist in the defense and to stand trial exists: (1) whether the petitioner has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding; and (2) whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960).

As a threshold matter, a petitioner, like Higgins, in a habeas proceeding claiming that he was incompetent at the time of trial must first come forward with "meaningful evidence" of mental incompetency. *See Demosthenes v. Baal*, 495 U.S. 731, 736 (1990) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990)). He must present facts "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt" as to his mental competency. *Dunn v. Johnson*, 162 F.3d 302, 306 (5th Cir. 1998) (quoting *Washington v. Johnson*, 90 F.3d 945, 950 (5th Cir. 1996)); *Goynes v. Dretke*, 139 Fed. App'x 616, 619 (5th Cir. 2005). Brief and conclusory allegations that his attorney's representation was deficient because of a failure to investigate and develop useful evidence will not suffice. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994). Higgins has failed to meet these burdens. In determining whether there is sufficient evidence to require an evaluation of mental competency, the United States Fifth Circuit has focused on three

factors: (1) existence of a history of irrational behavior; (2) the petitioner's demeanor during court proceedings; and (3) prior medical opinions. *Matthis v. Dretke*, 124 Fed. App'x 865, 875 (5th Cir. 2005); *see United States v. Williams*, 819 F.2d 605, 608 (5th Cir. 1987).

Each of these factors was considered and addressed by the Trial Court based on the testimony and reports of the sanity commission and Ms. Johannsen outlined above. The Court found that Higgins behavior was contrived, that he was well groomed and mannered during the court proceedings, and that the doctors found nothing to indicate that he suffered from a psychosis.

While Higgins's counsel did not introduced additional medical records or called a defense witness at the competency proceedings, Higgins has not provided anything to indicate what information a further investigation would have disclosed. Higgins had no recurrent history of long-term hospitalization. In fact, by his own statements to the doctors, he spent only a very short period in a facility as a teenager for evaluation after playing Russian Roulette with a friend. Based on the record, Higgins's has not shown that additional medical records or evidence existed that would show him incompetent to assist in his defense.

Although he claims to have "HAD A LONG medical and mental history" that counsel should have further investigated, he has not offered any medical evidence to support his conclusory suggestion of an actual long-term mental health diagnosis that would have impacted the *competency* finding that he was able to understand the proceedings against him and to assist his counsel at trial. In fact, he does not allege that he could not or did not assist counsel or understand his trial.

Thus, even if he could point to particular details in his prior medical treatment, and even considering the evidence submitted to the state courts at the various proceedings including trial, Higgins has not shown that counsel failed to present medical evidence that would have altered the

competency finding. "[T]he forensic test for competency does not require that the person be free of psychotic illness or psychiatric problems," and "[m]ental illness is not equivalent to incompetency." *Colburn v. Cockrell*, 37 Fed. App'x 90, 2002 WL 1021891, at *6 (5th Cir. May 9, 2002) (table, text in Westlaw). Similarly, a defendant may be found competent to stand trial even where there is evidence of drug addiction or the defendant is taking psychiatric medications. *Holmes v. King*, 709 F.2d 965, 967-68 (5th Cir. 1983); *Basso v. Thaler*, 359 Fed. App'x 504, 507-08 (5th Cir. 2010). Accepting Higgins's allegations about his medical past as true, nothing about his prior mental health treatment would have "unequivocally" shown him to be incompetent to understand the proceedings and assist in his defense. *See generally Dunn*, 162 F.3d 302.

Higgins has not shown that he received ineffective assistance of counsel in connection with the competency proceedings. The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*. Higgins is not entitled to relief on this claim.

**B.**     <u>**Trial Counsel at Trial**</u>

Higgins argues that his trial counsel was ineffective when he failed to investigate Higgins's prior mental health history and to call additional witnesses to support the insanity defense relied upon at trial. For the following reasons, the record reflects that Higgins's counsel was well-prepared to present the insanity defense, which was based on Higgins's alleged drug use and mental health history. As set forth below, Higgins has provided no basis to undermine the deference due his counsel's trial decisions or the denial of relief on this issue by the state courts.

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. Rev. Stat. Ann. § 15:432. To rebut the presumption of sanity and avoid criminal responsibility, a defendant has the burden of proving the affirmative defense of insanity by a preponderance of the

evidence.  La. Code Crim. P. art. 652.  The defense of insanity is defined under Louisiana law in La.

Rev. Stat. Ann. § 14:14:

> If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.

Under Louisiana law, "[c]riminal responsibility is not negated merely by the existence of a

mental disease or defect . . . ."  *State v. Williams*, 346 So.2d 181, 186 (La. 1977).  A mental disease

or disorder short of legal insanity is insufficient to support an insanity defense.  *Id*.; *see also State*

*v. Koon*, 704 So.2d 756, 768 (La. 1997); *State v. Weber*, 364 So.2d 952, 956 (La. 1978).

Furthermore, under Louisiana law, voluntary drug use during the commission of a crime also does

not necessarily exempt the offender from criminal responsibility.  La. Rev. Stat. Ann. § 14:15(2).[69]

At trial, defense counsel spent the majority of the voir dire colloquy discussing the insanity

defense and drug use with the prospective jurors.[70]  He assured that the jurors understood the burden

of proof and would not convict him based on his illegal drug use.[71]  He also asked the jury to

consider all of the psychiatric evidence to be presented in connection with the insanity defense.[72]

During opening statements, counsel outlined for the jury that they would hear evidence of

Higgins's Ecstasy, marijuana and alcohol use, his prior mood disorders, anger issues, and

---

[69]La. Rev. Stat. Ann. § 14:15 provides as follows:

The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows: . . .
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

[70]St. Rec. Vol. 3 of 4, Trial Transcript (continued), pp. 113, 205, 9/22/03.

[71]*Id*. at pp. 113, 121.

[72]*Id*. at pp. 121-22.

depression, and the periodic treatment for those conditions.[73]  In support of the defense, counsel

called Higgins's mother to testify.  She testified that Higgins as a child had "crying spells," played

Russian Roulette as a teenager, and had erratic grades in school.[74]  She indicated that she first took

him to a doctor for the crying spells when he was about five years old.[75]  She did not know who the

doctor was, but she recalled that he told her that if she let her son sit down and watch television he

would be all right.

Ms. Higgins insisted that her son did not act like a normal child.  She also indicated that, as

he grew older, he attended the Chancellor's Program at New Orleans Adolescent.  He also went to

programs at Eastlake Hospital and at the Children's Bureau, which was for children with deceased

fathers.  As an adult, he was also seen at the Central City Mental Health Clinic.  She also stated that

he occasionally had been prescribed medication, but she did not specify what or why.  He also had

discussed killing himself, even getting a machine gun to blow his brains out because he did not want

to live anymore.[76]

Ms. Higgins also recalled that he also would act violently and get into fights, including when

he felt he was being disrespected.[77]  She acknowledged that, when she took him to Central City

Mental Health Clinic on January 25, 2001, he admitted to attempting to set her house on fire, to

being in many fights, and to drinking a fifth of alcohol every Saturday.[78]  Ms. Higgins also had seen

---

[73]St. Rec. Vol. 3 of 4, Trial Transcript, pp. 23-25, 9/23/03.

[74]St. Rec. Vol. 4 of 4, Trial Transcript, p. 4, 9/24/03.

[75]*Id*. at p. 5.

[76]*Id*. at pp. 5, 7.

[77]*Id*. at p. 6.

[78]*Id*. at p. 7

him use marijuana, and knew that he reported having taken Ecstasy. She recalled that a "Dr. Hotard" told her that Higgins was mentally imbalanced and had mental disorders.[79]

Higgins's aunt, Michelle Holly, also testified about his crying spells.[80] She had never seen him under the influence of drugs or alcohol.[81] His sister, Shanikie Marcel, recalled the time when he played Russian Roulette at the age of 13.[82] She recalled that he and the entire family went for counseling at Eastlake Hospital and also New Orleans Adolescent Hospital. She could not remember a diagnosis or what medication he was given. She also did not recall any other bizarre behavior or knew him to do drugs or drink alcohol.[83]

Higgins himself testified that he had received treatment in about three facilities during his teen years.[84] Higgins also testified that the last time he sought mental health care from a doctor, he was about 15 or 16.[85] He denied having sought care as an adult.[86] He testified that he enjoyed marijuana and had also taken Ecstasy and Valium, in addition to prescribed medication.[87] He also

---

[79] *Id.* at p. 8.

[80] *Id.* at p. 10.

[81] *Id.*

[82] *Id.* at p. 12.

[83] *Id.* at pp. 12-13.

[84] *Id.* at pp. 14, 25.

[85] *Id.* at p. 25.

[86] *Id.*

[87] *Id.* at p. 15.

indicated that he regularly carried a gun, because he was concerned for his safety.[88]  He indicated that he "fight[s] real well" and that he gets angry for no reason.[89]

On the day of the murder, he recalled "celebrating" Father's Day by smoking marijuana and consuming several Ecstasy pills, one-half pill at a time over the course of the day.  He recalled going to his sister-in-law's home with Brown.[90]  While there, he and his sister-in-law began talking about different kinds of Ecstasy, and she called Adams to inquire about buying some "white dove" Ecstasy.[91]  Adams called his friend to arrange for Higgins to buy $350 worth of Ecstasy.  Higgins got Brown to drive him and Adams to make the deal in Slidell.[92]

When they arrived Domecq showed them "micro dots" pills instead of the "white doves."[93]  The pills looked small, and he thought they were "trying to run a whammy on me."  He recalled that Domecq insisted that he pay for them, as did Adams.  At that point he pulled his gun out, because "they was just closing in on me" and "they was trying to sell me some other kind of pills for my money."[94]  He claimed that Domecq backed off and Adams reached for the gun, and "it went off."[95]

---

[88]*Id*. at pp. 16, 27-28.

[89]*Id*. at p. 26.

[90]*Id*. at pp. 18, 29.

[91]*Id*. at p. 19.

[92]*Id*. at p. 20.

[93]*Id*. at p. 21

[94]*Id*. at pp., 21, 33.

[95]*Id*. at pp. 21-22.

He then acknowledges that he continued to shoot until the gun was empty.[96]  When asked if he wanted Adams dead, Higgins answered "I guess so."[97]

After conceding this, he also acknowledged that he did chase Adams down as he continued to shoot.[98]  He then ran back to the car and had Brown drive away.[99]  He ran because he wanted to get away.[100]  He also went to great lengths to hide the gun before heading home.[101]

Defense counsel also called Dr. James Denney to testify regarding drug use and mental illness.  Dr. Denney indicated that he was not prepared to make a diagnosis or that anyone could based on the information provided by the family and Higgins's himself.[102]  He further testified that Higgins's "mood disturbances" were well documented in his medical records.  He explained to the jury the clinical effects of Ecstasy, noting that the effects range from hallucinations and alterations in perception, to high energy levels, to a "kind of warm fuzzy" feeling in low doses, lessening the users inhibitions.[103]  Acutely and chronically, Ecstasy can lead to paranoia in some people and even psychosis, such as schizophrenia.[104]  It can also impact short term memory.[105]  It affects the person's

---

[96]*Id*. at p. 22.

[97]*Id*. at p. 37.

[98]*Id*. at p. 38.

[99]*Id*. at p. 22.

[100]*Id*. at p. 41.

[101]*Id*. at pp. 22-23, 41-42.

[102]*Id*. at p. 47.

[103]*Id*. at pp. 48-49.

[104]*Id*. at pp. 50, 51

[105]*Id*. at p. 51.

serotonin, which is a neurotransmitter in the brain, and when depleted can cause depression.[106] The person then seeks out more Ecstasy to get back the energetic, uninhibited feeling. The drug can also effect the person's dopamine levels, another neurotransmitter, that has to do with the brain's reward system.[107]

Having provided this information, Dr. Denney confirmed that he was not in a position to say that Higgins suffered from any of the side effects that can be caused by Ecstasy.[108] He also testified that having a mood disorder is not the same as a psychosis.[109] It is more of a roller coaster of emotions, causing a normally staid person to be promiscuous, or a frugal person to "spend money wildly."[110] He also testified that this type of personality disorder even in the extreme would not prevent a person from understanding right from wrong or from forming specific intent to act.[111] He also affirmed that Higgins's actions, as testified to by Higgins's himself, indicated a person who knew right from wrong and had specific intent to act.[112] He could not conclude, however, that drug usage would not have interfered with the formulation of specific intent.[113] He did not have enough

---

[106]*Id.* at pp. 49-50.

[107]*Id.* at p. 50.

[108]*Id.* at p. 54.

[109]*Id.* at p. 59.

[110]*Id.* at p. 60.

[111]*Id.* at pp. 64-65.

[112]*Id.* at pp.65-66.

[113]*Id* at, p. 66.

information to make a diagnosis or to conclude whether Higgins knew right from wrong at the time of the incident.[114]

Higgins's counsel presented a plethora of information to the jury in an effort to convince them that Higgins's drug use could have altered his ability to form specific intent and his knowledge of right from and wrong. The evidence pointed to his prior mental health issues and the consumption of drugs and alcohol on the day of the murder. The jury obviously chose not to believe that Higgins did not know right from wrong at the time of the offense and had specific intent to kill. There is nothing in the record that would fault defense counsel's efforts for the jury's reaching of that conclusion.

The jury had before it other evidence contrary to the insanity defense, including Higgins's own testimony, about his actions during and following the offense. Moreover, the record supports the jury's finding of Higgins's specific intent as evidenced by Higgins's own statement and testimony that he attacked the victim and Domecq because he thought he was being set up in the drug deal. He admittedly chased Adams and shot at him until his gun was empty, and then ran to get away from the scene and hide the gun.

In addition, the testimony of Brown and Domecq also provided evidence of his understanding and intent. Brown and Domecq both testified that Higgins reached for his gun and told Domecq to give him everything he had.[115] He then ordered Adams out of the car and told him to give him everything he had.[116] Higgins and Adams fought and Higgins hit Adams with the gun.

---

[114]*Id*. at pp. 66-67.

[115]*Id*. at pp. 103, 120.

[116]*Id*. at pp. 103, 120

While Adams was down, Higgins went through his pockets.[117]  When Adams got up, he ran and

Higgins shot him twice in the back.[118]  Higgins pursued Adams and Brown heard three more shots.[119]

Higgins then ran back to the car and told Brown to drive off.[120]  He eventually took over the driving

because he knew how to get out of the neighborhood.  He also drove to an apartment complex and

hid the gun before he had Brown drive him home.[121]

All of this was sufficient for the jury to determine that he acted with specific intent and knew

what he was doing was wrong.  As conceded by Dr. Denney at trial, unless he was impaired by drugs

at the time, Higgins's actions in repeatedly shooting, in acknowledging that he must have wanted

Adams dead, his flight from the scene, and his hiding of the gun all tended to show Higgins's

specific intent and knowledge of right and wrong.  The decision as to whether drugs impaired

Higgins's ability to have specific intent is a matter solely for the factfinder.  *State v. Williams*, 88

So.3d 1102, 1110 (La. App. 5th Cir. 2012); *see State v. Jordan*, 728 So.2d 954, 959 (La. App. 2d

Cir. 1999).

Furthermore, to the extent Higgins's suggests that counsel should have presented his prior

mental health records and called his prior physician, Dr. Hotard, to testify about his mental

condition, his claim fails.  The record indicates that Dr. Denney reviewed the prior medical records

and discussed Higgins's prior mental health diagnosis and treatment.  The jury had before the same

information Higgins's now complains was not before them.

---

[117]*Id*. at p. 104.

[118]*Id*. at pp. 104, 122.

[119]*Id*. at pp. 104, 123.

[120]*Id*. at p. 106.

[121]*Id*. at pp. 106-08.

In addition, "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of *Strickland* if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" *Williams v. Cockrell*, 31 Fed. App'x 832, 2002 WL 180359, at *3 (5th Cir. Jan. 4, 2002) (table, text in Westlaw) (quoting *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997)).

Higgins did not present anything to the state courts, or to this court, that would indicate that Dr. Hotard's testimony, or other medical records, would have provided any information that would have impacted the jury's decision or that would have differed from Dr. Denney's testimony and conclusions. Dr. Denney relied upon the diagnosis of "mood disorder" apparently made during Higgins's prior treatment. Counsel therefore chose to present the available information through the expert at hand, which clearly falls within the ambit of sound trial strategy.

Counsel was not deficient or prejudicial in his presentation of evidence to support the defense. The fact that the defense was not successful in no way establishes that counsel was ineffective. *See Martinez v. Dretke*, 99 Fed. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689 (citations omitted).

Higgins has not provided a basis to undermine the deference due his counsel's trial decisions or the state court's findings under *Strickland*. The state courts' denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*. He is not entitled to relief on this claim.

### C.     Appellate Counsel

Higgins alleges that his appellate counsel was ineffective when she failed to familiarize herself with his mental health status and the case before lodging the appeal. He complains that she relied on the insanity defense presented by trial counsel as a basis for the only claim raised, insufficient evidence. He argues that the defense already proved to be unsuccessful, and she instead should have raised a claim of ineffective assistance of trial counsel during the competency hearing and trial.

The proper standard for evaluating a claim that appellate counsel was ineffective in raising issues on direct appeal is that set forth in *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In applying this standard, the petitioner must establish that his appellate counsel unreasonably failed to discover and raise a nonfrivolous issue and show a reasonable probability that, but for his counsel's unreasonable failure to raise the issue, he would have prevailed on his appeal. *Smith*, 528 U.S. at 285.

Furthermore, the Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not raise every nonfrivolous claim; instead, counsel may legitimately select from among them in the exercise of professional judgment to maximize the likelihood of success on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). Thus, appellate counsel has the discretion to exclude even a non-frivolous issue if that issue was unlikely to prevail. *See Anderson v. Quarterman*, 204 Fed. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his

counsel should have raised on direct appeal . . . lack merit.  As such, failure to raise these issues did not prejudice Anderson."); *Penson v. Ohio*, 488 U.S. 75, 83-84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); *Kossie v. Thaler*, 423 Fed. App'x 434, 437 (5th Cir. 2011) (recognizing the Supreme Court's premise that only when ignored claims are stronger than those raised will the presumption of effectiveness be overcome) (citing *Smith*, 528 U.S. at 288).  Higgins has not pointed to any merited issue that would have called for counsel to include it in the appeal.

As discussed herein, Higgins's ineffective assistance of trial counsel claims are without merit under *Strickland*.  This was the conclusion reached by the Louisiana courts on post-conviction review and by this Court here.  He can not show that the outcome of his appeal would have been any different had counsel raised the claims on direct appeal.

In addition, it is a well-settled that Louisiana laws deems that claims of ineffective assistance of trial counsel are more properly raised in an application for post-conviction relief in the district court rather than on direct appeal.  *State v. Watson*, 817 So.2d 81, 84 (La. 2002); *State v. Truitt*, 500 So.2d 355, 359 (La. 1987); *see also State v. Smothers*, 836 So.2d 559 (La. App. 5th Cir. 2002) (refusing to consider ineffective assistance of counsel claim on direct appeal); *State v. Hall*, 843 So.2d 488 (La. App. 4th Cir. 2003) (same); *State v. Griffin*, 839 So.2d 1148 (La. App. 3d Cir. 2003) (same).  As such, Higgins's appellate counsel either did not act deficiently in failing to raise the ineffective assistance of trial counsel claim on appeal.  Even if her failure to do so could be considered deficient, Higgins's was not prejudiced by the failure since the state appellate court likely would have deferred the claim to post-conviction review, which Higgins's later pursued.

Having failed to establish a deficient performance or prejudice arising from appellate counsel's actions, Higgins's is not entitled to relief. The state courts' denial of relief was not contrary to, or an unreasonable application of, federal law.

## VII.  Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Kealo Higgins's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[122]

New Orleans, Louisiana, this 28th day of December, 2012.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[122]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.